J-S36033-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| WAYNE ROBERT JOHNSON | : | |
| | : | |
| Appellant | : | No. 177 MDA 2024 |

Appeal from the Judgment of Sentence Entered November 7, 2023
In the Court of Common Pleas of Luzerne County Criminal Division at
No(s):  CP-40-CR-0002521-2022

BEFORE:  LAZARUS, P.J., McLAUGHLIN, J., and BENDER, P.J.E.

MEMORANDUM BY BENDER, P.J.E.:                    **FILED: OCTOBER 22, 2024**

Appellant, Wayne Robert Johnson, appeals from the judgment of sentence of 12 months' probation, imposed after a jury convicted him of obstruction of the administration of law (hereinafter, "obstruction"), 18 Pa.C.S. § 5101.  On appeal, Appellant seeks to challenge the sufficiency of the evidence to sustain his conviction.  Additionally, Appellant's counsel, Robert M. Buttner, Esq., seeks to withdraw his representation of Appellant pursuant to ***Anders v. California***, 386 U.S. 738 (1967), and ***Commonwealth v. Santiago***, 978 A.2d 349 (Pa. 2009).  After careful review, we affirm Appellant's judgment of sentence and grant counsel's petition to withdraw.

The trial court presented a detailed summary of the facts of Appellant's case, which we adopt herein.  ***See*** Trial Court Opinion (TCO), 4/15/24, at 2-7.  Briefly, Appellant was arrested and charged with obstruction and harassment after he refused to allow police officers to enter his home to

conduct a welfare check on his 7-year-old daughter. Appellant proceeded to a jury trial on September 18, 2023. At the close thereof, the jury acquitted him of harassment, and convicted him of obstruction.

On November 7, 2023, the court sentenced Appellant to 12 months' probation. Appellant filed a timely, post-sentence motion, which was denied. He then filed a timely notice of appeal, and complied with the trial court's order to file a Pa.R.A.P. 1925(b) statement. The court filed its Rule 1925(a) opinion on April 15, 2024.

On July 19, 2024, Attorney Buttner filed with this Court a petition to withdraw from representing Appellant. Counsel also filed an **_Anders_** brief, discussing the following issue that Appellant seeks to raise on appeal:

> 1. Did the Commonwealth fail to prove, beyond a reasonable doubt, that … Appellant obstructed or impaired the administration of law or governmental function when the Commonwealth failed to establish the following:
>
>> a. that … Appellant knew the officers were at his residence to perform a welfare check and, therefore, failed to prove he acted intentionally;
>>
>> b. that … Appellant possessed the intent to and undertook actions that constituted a substantial step in an attempt to obstruct or impair the officers from performing a governmental function or the administration of law;
>>
>> c. that … Appellant possessed the intent to obstruct or impair officers from performing a governmental function or the administration of law;
>>
>> d. that … Appellant affirmatively interfered with or impaired officers from performing a governmental function or carrying out the administration of law?

**_Anders_** Brief at 3.

Attorney Buttner concludes that this issue is frivolous, and that Appellant has no other, non-frivolous claims he could pursue herein. Accordingly,

> [t]his Court must first pass upon counsel's petition to withdraw before reviewing the merits of the underlying issues presented by [the appellant]. **Commonwealth v. Goodwin**, 928 A.2d 287, 290 (Pa. Super. 2007) (*en banc*).
>
> Prior to withdrawing as counsel on a direct appeal under **Anders**, counsel must file a brief that meets the requirements established by our Supreme Court in **Santiago**. The brief must:
>
>> (1) provide a summary of the procedural history and facts, with citations to the record;
>>
>> (2) refer to anything in the record that counsel believes arguably supports the appeal;
>>
>> (3) set forth counsel's conclusion that the appeal is frivolous; and
>>
>> (4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.
>
> **Santiago**, 978 A.2d at 361. Counsel also must provide a copy of the **Anders** brief to his client. Attending the brief must be a letter that advises the client of his right to: "(1) retain new counsel to pursue the appeal; (2) proceed pro se on appeal; or (3) raise any points that the appellant deems worthy of the court[']s attention in addition to the points raised by counsel in the **Anders** brief." **Commonwealth v. Nischan**, 928 A.2d 349, 353 (Pa. Super. 2007)….

**Commonwealth v. Orellana**, 86 A.3d 877, 879-80 (Pa. Super. 2014). After determining that counsel has satisfied these technical requirements of **Anders** and **Santiago**, this Court must then "conduct a simple review of the record to ascertain if there appear[s] on its face to be arguably meritorious issues that

counsel, intentionally or not, missed or misstated." **Commonwealth v. Dempster**, 187 A.3d 266, 272 (Pa. Super. 2018) (*en banc*).

In this case, Attorney Buttner's **Anders** brief complies with the above-stated requirements. Namely, he includes a summary of the relevant factual and procedural history, he refers to portions of the record that could arguably support Appellant's claim, and he sets forth his conclusion that Appellant's appeal is frivolous. He also explains his reasons for reaching that determination, and supports his rationale with citations to the record and pertinent legal authority. Attorney Buttner also states in his petition to withdraw that he has supplied Appellant with a copy of his **Anders** brief. Additionally, counsel attached a letter he sent to Appellant to his petition to withdraw, in which he informed Appellant of the rights enumerated in **Nischan**. Accordingly, counsel has complied with the technical requirements for withdrawal. We will now independently review the record to determine if Appellant's issue is frivolous, and to ascertain if there are any other, non-frivolous claims he could pursue on appeal.

Appellant challenges the sufficiency of the evidence to sustain his conviction for obstruction. Initially, we observe that,

> [w]hether the evidence was sufficient to sustain the charge presents a question of law. **Commonwealth v. Toritto**, 67 A.3d 29 (Pa. Super. 2013) (*en banc*). Our standard of review is *de novo*, and our scope of review is plenary. **Commonwealth v. Walls**, 144 A.3d 926 (Pa. Super. 2016). In conducting our inquiry, we examine[,]

whether the evidence at trial, and all reasonable inferences derived therefrom, when viewed in the light most favorable to the Commonwealth as verdict-winner, [is] sufficient to establish all elements of the offense beyond a reasonable doubt. We may not weigh the evidence or substitute our judgment for that of the fact-finder. Additionally, the evidence at trial need not preclude every possibility of innocence, and the fact-finder is free to resolve any doubts regarding a defendant's guilt unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. When evaluating the credibility and weight of the evidence, the fact-finder is free to believe all, part or none of the evidence. For purposes of our review under these principles, we must review the entire record and consider all of the evidence introduced.

> ***Commonwealth v. Trinidad***, 96 A.3d 1031, 1038 (Pa. Super. 2014) (quotation omitted).

***Commonwealth v. Rojas-Rolon***, 256 A.3d 432, 436 (Pa. Super. 2021), *appeal denied*, 285 A.3d 879 (Pa. 2022).

Presently, in assessing Appellant's challenge to the sufficiency of the evidence, we have reviewed the certified record, the ***Anders*** brief submitted by Attorney Buttner, and the applicable law.[1] Additionally, we have examined the well-reasoned opinion of the Honorable Joseph F. Sklarosky, Jr., of the Court of Common Pleas of Luzerne County. We conclude that Judge Sklarosky's comprehensive opinion accurately disposes of the issue presented by Appellant. Accordingly, we adopt Judge Sklarosky's opinion as our own in

---

[1] On August 19, 2024, the Commonwealth filed a letter with this Court notifying us that it would not be filing a brief in this case, as it agrees with Attorney Buttner's conclusion that Appellant's claim is frivolous, and that he has no other, non-frivolous issues to raise on appeal.

agreeing with Attorney Buttner that Appellant's claim is frivolous. Additionally, our independent review of the record reveals no other, non-frivolous claims that Appellant could assert herein. Thus, we affirm Appellant's judgment of sentence for the reasons set forth in Judge Sklarosky's opinion, and grant Attorney Buttner's petition to withdraw.

Judgment of sentence affirmed. Petition to withdraw granted. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 10/22/2024

COMMONWEALTH OF PENNSYLVANIA    : IN THE COURT OF COMMON PLEAS
                           :      OF LUZERNE COUNTY

       vs.                        :

                           :    CRIMINAL DIVISION

                           :

WAYNE JOHNSON               :

                           :      NO. 2521 OF 2022

## OPINION PURSUANT TO Pa.R.A.P. 1925(a)

### I. Procedural History

Defendant, Wayne Johnson, appeals from this Court's judgment of sentence imposed on November 7, 2023.[1] Defendant's post-sentence motion was denied on January 3, 2024, after a hearing thereon. After a jury trial commencing on September 18, 2023, Defendant was convicted of a single count of obstruction of administration of law or other governmental function.[2]

Defendant filed a timely Notice of Appeal on February 1, 2024. Defendant filed a Concise Statement of Errors Complained of on Appeal (Statement) pursuant to Pa.R.A.P. 1925(b) on February 22, 2024. Defendant raises the following issues on appeal as is set forth here verbatim:

1. Did the Commonwealth fail to prove, beyond a reasonable doubt, that the Defendant obstructed or impaired the administration of law or governmental function when the Commonwealth failed to establish the following:

   a. that the Defendant knew the officers were at his residence to perform a welfare check and, therefore, failed to prove he acted intentionally;

   b. that the Defendant possessed the intent to and undertook actions that constituted a substantial step in an attempt to obstruct or impair the officers from performing a governmental function or the administration of law;

   c. that the Defendant possessed the intent to obstruct or impair officers from performing a governmental function or the administration of law;

   d. that the Defendant affirmatively interfered with or impaired officers from performing a governmental function or carrying out the administration of law?

---

[1] Defendant was sentenced to 12 months of probation.
[2] 18 Pa.C.S.A. § 5101.

1

CLERK OF COURTS CRIMINAL
LUZ CNTY APR15'24PM3:50

## II. Summary of relevant testimony

Officer Brandyn Cole ("Officer Cole") and Officer Frank Oatridge ("Officer Oatridge") with the Plains Township Police Department ("PTPD") testified on behalf of the Commonwealth. N.T. 9/20/23 at 34-61, 61-94. Both Officer Cole and Officer Oatridge were on duty as patrol officers during the 10:00 pm - 6:00 am shift on May 31, 2022. Id. at 36, 63. At approximately 2:30 am, both officers were dispatched to Defendant's home for a verbal domestic incident. Id. at 36, 64. It took Officer Cole approximately five minutes and Officer Oatridge approximately 5 to 8 minutes to arrive at Defendant's home after receiving the dispatch. Id. at 37, 64. Upon arriving at the dispatched address, the officers observed a woman, later identified as Angelica Carver ("Carver"), sitting inside a vehicle with an infant in her arms. Id. at 37, 65. Carver told the officers that she was in an argument with her boyfriend, who she identified as Defendant, and that he was highly intoxicated inside their home with her 7-year-old daughter. Id. at 38, 65-66. Carver told the police officers she had concerns for the 7-year-old girl and was fearful that she was in danger. Id. at 38, 81. Carver also told the police officers that Defendant had been drinking all day, and that Defendant consumed a bottle of Crown Royal and a 12 pack of beer. Id. at 66, 121.

In an effort to conduct a welfare check on the 7-year-old girl, the officers went to the front door of the house with Carver. Id. at 38, 66. To get to the front door of the house, one must walk up a few steps that lead to a small porch. Id. at 39. Both officers and Carver were on the small front porch when the officers knocked on the front door. Id. While the officers were knocking on the front door, they announced that they were police officers who were trying to conduct a welfare check on the 7-year-old girl inside the home. Id. at 39, 67. After approximately five minutes of knocking and announcing their presence with no answer at the front door, Carver attempted to use

2

her house key on the doorknob, but the deadbolt was locked and she did not have a key to the deadbolt. Id. at 40, 67.

Officers then went with Carver to the back of the residence so she could try to unlock the back door with her house key. Id. at 40, 68. As Carver was trying to unlock the back door, it was being re-locked from the inside. Id. at 40. The officers continued to announce their presence and that they were there to conduct a welfare check on the 7-year-old child inside. Id. at 40-41. After a few minutes of Carver struggling to try to get the back door unlocked, Officer Oatridge tried to unlock the door and also felt the doorknob being re-locked from the inside. Id. at 41, 68. Officer Oatridge was unsuccessful in unlocking the door and even broke the key inside the doorknob due to the resistance on the lock from the inside of the house. Id. at 41, 68. At this point, Officer Oatridge asked Carver to call Defendant's cell phone to try to make contact with him. Id. at 42, 69. When Carver called Defendant's cell phone, the officers could hear Defendant's phone ringing inside the home on the other side of the back door. Id. at 42, 69. Defendant did not answer the phone call from Carver. Id. at 42, 69. After Carver disconnected the phone call, she asked Officer Oatridge if she could break a window to the home and Officer Oatridge advised against it. Id. at 69.

The officers next went to the front door of the house again where they began knocking and announcing their presence to conduct a welfare check on the child inside the home. Id. at 42-43, 70. The officers continued to knock on the front door of the home and announce their presence for approximately 5-10 minutes. Id. at 42, 70. While knocking and announcing their presence, the officers heard a loud smashing sound come from the side of the home due to Carver throwing an empty beer bottle through a window. Id. at 43, 71. Defendant then came up to the front window in an upset manner from inside the house and told the police officers that Carver just broke his

3

window. Id. at 43, 71. The officers continued to tell Defendant that they were there to conduct a welfare check on the 7-year-old girl inside the home. Id. at 72. Defendant then opened the front door of the home and began to yell and curse at the officers. Id. at 44, 72. As Defendant was getting close to the officers on the front porch, both officers smelled a strong odor of alcoholic beverage coming from Defendant's breath. Id. at 45, 74. The officers continued to explain to Defendant that they were there to conduct a welfare check on the 7-year-old girl inside the home. Id. at 45. Defendant would not calm down and continued to escalate the situation. Id. at 74. Defendant said he would not allow the officers to conduct the welfare check and blocked the entryway of the home with his body when Officer Oatridge tried to enter the home. Id. at 44, 74.

After trying for several minutes to calm Defendant down and negotiate with him to allow the officers inside the home to conduct a welfare check on the 7-year-old girl, Officer Oatridge explained to Defendant that he was preventing officers from performing the welfare check on the child and that officers would use the force of their tasers to get inside to check on the child if necessary. Id. at 45-46, 74. Officer Oatridge again tried to enter the home and Defendant blocked his access by standing in front of the doorway. Id. at 75. Officer Oatridge then removed his taser from its holster and tried a third time to gain entry into the home, but Defendant again blocked his access by standing in front of the doorway. Id. At this time, Officer Oatridge stepped back and announced he was going to deploy his taser. Id. Defendant started to retreat back into the home so Officer Cole released his taser, striking Defendant before he was able to close the front door. Id. at 46, 75-76. When Defendant was struck with the taser, the momentum caused him to fall backwards to the ground which swung the front door closed. Id. at 46, 76. Officers were then able to open the now unlocked front door and enter the home to conduct the welfare check on the child inside. Id. at 46, 76. Upon entering the home, the officers detained Defendant and conducted the

4

welfare check on the 7-year-old girl who was then coming down the steps from upstairs. Id. at 47, 58, 76-77. Officer Oatridge took the 7-year-old girl to Carver. Id. at 47. Carver then went upstairs with the 7-year-old girl and the infant. Id. at 47, 77. It took officers approximately 45 minutes until they were able to conduct the welfare check on the child. Id. at 47, 77.

The defense presented the testimony of Angelica Carver. Id. at 98-120. Carver testified that she has been in a relationship with Defendant for ten years, that they have 3 children together, and that they lived together at the time of the incident on May 31, 2022, in addition to living together at the time of her testimony on September 20, 2023. Id. at 99-100. Carver testified that she was with Defendant on the evening of May 30, 2022, when she saw him drink a couple of bottles of beer. Id. at 100-101. She then testified that she "don't watch him drink" when asked if it was only a couple bottles of beer he drank that night. Id. Carver testified that she and Defendant got into a small argument so she decided to go to a gas station, but could not remember what she was going there to get. Id. at 101. Carver further testified that she was going to drive to the gas station to diffuse the situation, but that it wasn't a "heated" argument that she got into with Defendant. Id. Carver testified that she took her infant child with her because the child was awake and she was still breast feeding the infant at the time. Id.

Carver testified that she was in her vehicle outside the home for a few minutes before she realized that she forgot her debit card. Id. at 102. She then noticed that all the lights were off inside the house, so she figured Defendant went upstairs to sleep since they were already in bed getting ready to go to sleep when the argument started. Id. Carver tried to unlock the door to get her debit card, but only had a key to the door knob and the deadbolt was locked, too. Id. Carver attempted to call Defendant, but he did not answer the phone so Carver called 911. Id. Carver testified that

5

she told 911 dispatchers that she had locked herself out and needed help gaining access to her home, specifically requesting fireman assistance. Id. at 103.

When police officers arrived on scene, Carver testified that she explained to them that she had gotten into a little argument with Defendant and he had locked the door. Id. at 103. She explained to the officers that she has a key to the house, but it is only to the door knob and that Defendant engaged the deadbolt which she doesn't have a key to. Id. Carver testified that she never told the police officers she had any concerns for her daughter's safety inside the home. Id. at 103.04. Carver also denied ever telling police officers Defendant was intoxicated. Id. at 103-04. Carver testified that police officers began to knock on the front door, but never announced who they were or why they were there. Id. at 104. Since they did not get an answer when knocking on the front door, Carver then advised police that she had a key to the back door. Id. Carver and the two officers went to the back door where Carver tried to unlock the back door with her key. Id. at 104-05. Carver said that it felt like someone was holding the lock on the other side of the door preventing her from unlocking the door. Id. Carver then told the officers that Defendant might be on the other side of the door holding the lock. Id. Carver did confirm that one of the officers tried to unlock the back door himself but, due to the resistance on the lock from inside the house, the key broke inside the doorknob. Id. at 106.

Carver said that police officers then asked her to call Defendant's cell phone, so she did. Id. at 105. Carver testified that Defendant did not answer the call and that she did not hear any phone ringing from inside the home. Id. at 105-06. Carver testified it was at this point she asked the police officers to leave because she felt that Defendant would open the door for her if the officers were not present. Id. at 107. Carver testified that the officers appeared to get aggravated, refused to leave, and stated they were not going to leave her outside at night with her baby. Id. at

6

107. Carver testified that the officers then began to knock on the front door again while looking through the windows with their flashlights. Id. at 107-108. Carver testified that at this point she advised the officers she would go to a hotel, but would like to get inside the house to get the 7-year-old child because she would rather take her daughter to the hotel with her. Id. at 108. Carver testified that when the police officers asked her if she felt her daughter was safe inside the house she continued to tell the officers her daughter was safe and that is why she left her daughter inside the home in the first place. Id. at 109-10. Carver testified that the police officers explained to her that they cannot get her daughter for her if Carver had no reason to believe she was unsafe. Id. at 111.

Carver testified that she then told the officers she was going to check all the windows and began to check them. Id. at 111. Carver testified that while checking the windows, she remembered one of the officers telling her she could smash the window in her own house if she wanted to, so she did. Id. at 111-12. Carver testified that she smashed the back window and began to yell for her daughter to come open the back door, but her daughter never came. Id. at 113. Carver testified she then heard Defendant open the front door so she headed to the front of the house. Id. Carver testified she suddenly heard yelling so ran to the front of the house and within 30 seconds, Defendant was already on the ground after being tased. Id. at 113-115. Carver testified the only thing that she could remember hearing was Defendant saying that the police cannot come inside his house. Id. at 114.

**III. Legal analysis**

Stated again, Defendant raises the following allegation of error:

1.  Did the Commonwealth fail to prove, beyond a reasonable doubt, that the Defendant obstructed or impaired the administration of law or governmental function when the Commonwealth failed to establish the following:

7

a. that the Defendant knew the officers were at his residence to perform a welfare check and, therefore, failed to prove he acted intentionally;

b. that the Defendant possessed the intent to and undertook actions that constituted a substantial step in an attempt to obstruct or impair the officers from performing a governmental function or the administration of law;

c. that the Defendant possessed the intent to obstruct or impair officers from performing a governmental function or the administration of law;

d. that the Defendant affirmatively interfered with or impaired officers from performing a governmental function or carrying out the administration of law?

The standard applied in reviewing the sufficiency of the evidence is whether, viewing all the evidence admitted at trial in the light most favorable to the Commonwealth as verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. Commonwealth v. Evans, 901 A.2d 528, 532 (Pa. Super. 2006). In addition, the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Id. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. Id.

If the fact finder reasonably could have determined from the evidence adduced that all the necessary elements of the crime were established, then that evidence will be deemed sufficient to support the verdict. Commonwealth v. Wood, 637 A.2d 1335, 1343 (Pa. Super. 1994). The standard applies equally to cases in which the evidence is circumstantial, rather than direct, as long as the evidence as a whole links the accused to the crime charged beyond a reasonable doubt. Commonwealth v. Wright, 865 A.2d 894, 910 (Pa. Super. 2004). The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Commonwealth v. Lehman, 820 A.2d 766, 772 (Pa. Super. 2003).

8

In making a credibility determination, the trier of fact - in this case the jury - is free to believe all, part, or none of the evidence presented during trial. Commonwealth v. Beasley, 138 A.3d 39, 45 (Pa. Super. 2016). In a sufficiency of the evidence claim, the court may not substitute its judgment for that of the fact-finder. Commonwealth v. Williams, 153 A.3d 372, 375 (Pa. Super. 2016).

Defendant was convicted of obstructing administration of law or other governmental function pursuant to 18 Pa.C.S. § 5101, which requires proof that, in relevant part, a: "...[defendant] intentionally obstructs [or] impairs ... the administration of law or other governmental function by force, violence, physical interference or obstacle ...".

To find a person guilty of obstructing administration of law or other governmental function the Commonwealth must first prove beyond a reasonable doubt that the defendant intentionally obstructed or impaired the administration of law or a governmental function.[3] Pa.C.S.A. 18 § 5101. A person acts intentionally when it is their conscious object to cause the obstruction or impairment to the administration of law or governmental function. Pa.C.S.A. 18 § 302(b)(1). The administration of law or other governmental function includes police acting within their official duties, which includes performing welfare checks when requested or needed. A person cannot violate this statute unless they use means that affirmatively interfere with governmental functions; it is not enough to merely try avoiding complying with the law. An intentional, although unsuccessful, attempt to obstruct or impair the administration of law or other governmental function is also included under this statute. Commonwealth v. Trolene, 397 A.2d 1200, 1204 (Pa. Super. 1979).

---

[3] It must also be proven beyond a reasonable doubt that the defendant did so by use of unlawful force, violence, or physical interference or obstacle. Defendant did not raise the issue of this element in his Statement; therefore, it is waived. Pa.R.A.P. 1925(b)(4).

Here, Defendant claims that the Commonwealth failed to prove beyond a reasonable doubt that he intentionally obstructed or impaired the administration of law or governmental function because he did not know the police were at his home to perform a welfare check.[4] The Commonwealth presented credible evidence that Defendant knew why the police officers were at his residence and therefore that Defendant acted intentionally.

The Commonwealth provided testimony from both Officer Cole and Officer Oatridge that both of the officers continued to knock and announce their presence and reason for being there for approximately 30 minutes before Defendant finally opened the front door. Defendant only opened the door because Carver threw a bottle through one of the windows to try to gain access to the house. Both officers testified that once Defendant opened the front door, they were able to tell him directly that they were there to conduct a welfare check on the 7-year-old girl inside the home. Notwithstanding, Defendant continued to refuse to allow the officers access to the child and told them he would not allow it to happen. Defendant told the officers that he would not let them inside his home to conduct the welfare check and physically blocked their access to the inside of the home by blocking the doorway during all three of Officer Oatridge's attempts to enter the home to conduct the welfare check on the child. It is clear from the evidence presented at trial that the jury could conclude that Defendant knew why the police officers were at his residence - to conduct a welfare check on the 7-year-old child inside the home - and, therefore, that Defendant acted intentionally when he refused to allow them access to the child and obstructed or impaired the police officers from the administration of law or governmental function.

Defendant also claims that the Commonwealth failed to prove beyond a reasonable doubt that Defendant undertook actions that constituted a substantial step in an attempt to interfere with

---

[4] These claims are argued separately as subsection (a), part of subsection (b), and subsection (c) in Defendant's Statement. However, the Court will address them together to avoid unnecessary duplication.

10

or impair, or affirmatively interfered with or impaired, officers from performing a governmental function or carrying out the administration of law.[5] The Commonwealth presented credible evidence that Defendant took actions that were in an attempt to obstruct or impair and was an affirmative interference with or impairment of the police officers from conducting a welfare check on a 7-year-old child. The Commonwealth provided testimony from both officers in this matter that they continued to knock and announce their presence for approximately 30 minutes before Defendant opened the door only due to Carver breaking a window on the house, and that while trying to unlock the back door to gain access Defendant was re-locking it from the inside, and that Defendant physically refused the police access to the home by blocking the doorway and telling them they cannot come inside his home to conduct the welfare check. Defendant needed to be tasered and incapacitated for the police officers to be able to enter the home and conduct the welfare check on the child inside. The jury was within their right to believe this testimony and conclude that all of these acts by Defendant show he undertook acts that constitute a substantial step in an attempt to obstruct or impair, or affirmatively interfered with or impaired, the officers from performing a government function or the administration of law; specifically, a welfare check on a 7-year-old child.

Although Carver testified that the police officers never identified themselves or why they were knocking on the door, that she never told the police she thought her 7-year-old daughter was in danger and that she continuously asked the police to leave, the jury as fact-finder was free to believe all, part or none of her testimony. *See* Commonwealth v. Pappas, 845 A.2d 829 (Pa. Super. 2004).

---

[5] These claims are argued separately as part of subsection (b) and subsection (d) of Defendant's Statement. However, the Court will address them together to avoid unnecessary duplication.

11

In our judgment, the Commonwealth presented sufficient evidence to establish beyond a reasonable doubt that Defendant intentionally obstructed or impaired the administration of law or governmental function.

## III.    Conclusion

For the foregoing reasons, this Court respectfully submits that Defendant's judgment of sentence should be undisturbed on appeal.

ORDER ATTACHED SEPARATELY AS PAGE 13

COMMONWEALTH OF PENNSYLVANIA      :    IN THE COURT OF COMMON PLEAS
                                      :       OF LUZERNE COUNTY
                                        :       CRIMINAL DIVISION

             vs.                          :

WAYNE JOHNSON,                  :     NO.    CP-40-CR-0002521-2022
                Defendant        :

## O R D E R

AND NOW, this 15th day of April , 2024, it is hereby **ORDERED, DECREED AND DIRECTED** that the attached opinion is entered of record pursuant to Pa.R.A.P. 1925(a).

It is **FURTHER ORDERED, DECREED, and DIRECTED** that the Luzerne County Clerk of Courts shall transmit the record of the above captioned case to the Prothonotary of the Superior Court pursuant to Pa.R.A.P. 1931 **within 5 days** from the date of this Order.

BY THE COURT:

_____
JOSEPH F. SKLAROSKY, JR.    J.

Copies:

District Attorney

Robert Buttner, Esquire
Assistant Public Defender

CLERK OF COURTS CRIMINAL
LUZ CNTY APR 15/24